GINSBURG, Circuit Judge:
I. Background........................ ....................................1248
II. Analysis .................................................................1250
A. Statutory Authority...................................................1250
B. The Second Amendment...............................................1251
1. The Heller Decision................................................1252
2. The Constitutional Framework......................................1252
3. Registration Requirements .........................................1253
a. Do the registration requirements impinge upon the Second Amendment right?...........................................1253
i. Basic registration requirements..............................1253
ii. Novel registration requirements .............................1255
b. Intermediate scrutiny is appropriate..............................1256
c. Intermediate scrutiny requires remand...........................1258
4. Assault Weapons and Large-Capacity Magazines......................1260
a. Do the prohibitions impinge upon the Second Amendment right?____1260
b. Intermediate scrutiny is appropriate..............................1261
c. The prohibitions survive intermediate scrutiny.....................1262
III. Conclusion 1264
Appendix: Regarding the Dissent................................................1264
A. Interpreting Heller and McDonald......................................1264
B. Registration Requirements.............................................1267
C. Assault Weapons......................................................1267
In June 2008 the Supreme Court held the District of Columbia laws restricting the possession of firearms in one’s home violated the Second Amendment right of individuals to keep and bear arms. See District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783. In the wake of that decision, the District adopted the Firearms Registration Amendment Act of 2008 (FRA), D.C. Law 17-372, which amended the Firearms Control Regulations Act of 1975, D.C. Law 1-85. The plaintiffs in the present case challenge, both facially and as applied to them, the provisions of the District’s gun laws, new and old, requiring the registration of firearms and prohibiting both the registration of “assault weapons” and the possession of magazines with a capacity of more than ten rounds of ammunition. The plaintiffs argue those provisions (1) are not within the District’s congressionally delegated legislative authority or, if they are, then they (2) violate the Second Amendment.
The district court granted summary judgment for the District and the plaintiffs appealed. We hold the District had the authority under D.C. law to promulgate the challenged gun laws, and we uphold as constitutional the prohibitions of assault *1248 weapons and of large-capacity magazines and some of the registration requirements. We remand the other registration requirements to the district court for further proceedings because the record is insufficient to inform our resolution of the important constitutional issues presented.
I. Background
In Heller, the Supreme Court held the Second Amendment protects “an individual right to keep and bear arms,” 554 U.S. at 595, 128 S.Ct. 2783, but not a right “to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,” id. at 626, 128 S.Ct. 2783. More specifically, the Court held unconstitutional the District’s “ban on handgun possession in the home” as well as its “prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense,” id. at 635, 128 S.Ct. 2783, noting “the inherent right of self-defense [is] central to the Second Amendment right,” id. at 628, 128 S.Ct. 2783. Therefore, unless the plaintiff was “disqualified from the exercise of Second Amendment rights” for some reason, such as a felony conviction, the District had to permit him to register his handgun. Id. at 635, 128 S.Ct. 2783.
Shortly after the Supreme Court issued its decision in Heller, the D.C. Council passed emergency legislation in an effort to conform the District’s laws to the Supreme Court’s holding while it considered permanent legislation. The Council’s Committee on Public Safety and the Judiciary then held three public hearings on the subject. In December 2008, upon the Committee’s recommendation, the full Council passed the FRA. 56 D.C. Reg. 3438 (May 1, 2009).
The plaintiffs challenge a host of provisions of the new scheme for regulating firearms.* First they object to the general requirement that owners register their firearms, D.C.Code § 7-2502.01(a). In particular, the plaintiffs challenge the following requirements that apply each time a person applies to the Metropolitan Police Department (MPD) for a registration certificate. Each applicant must:
• Disclose certain information about himself — such as his name, address, and occupation — and about his firearm. § 7-2502.03(b).
• Submit “for a ballistics identification procedure” each pistol to be registered. § 7-2502.03(d). Ballistics testing is not required for long guns. See id.
• Appear in person and, at the MPD’s request, bring with him the firearm to be registered. § 7-2502.04(c).
• Register no more than one pistol in a 30-day period. § 7-2502.03(e).
• Renew each registration certificate “3 years after the date of issuance.” § 7-2502.07a(a). In order to renew the certificate, the applicant must “submit a statement ... attesting to” his current address, possession of the firearm, and compliance with the registration requirements in § 7-2502.03(a). § 7-2502.07a(c).
In addition, the plaintiffs challenge five requirements that are more similar to licensing the owner of the firearm than to *1249 registering the weapon itself.* Specifically, the applicant must:
• Have vision qualifying one for a driver’s license. § 7-2502.03(a)(ll).
• Demonstrate knowledge of the District’s laws pertaining to firearms “and, in particular, the safe and responsible use, handling, and storage of the same.” § 7-2502.03(a)(10).
• Submit to being fingerprinted and photographed. § 7-2502.04; D.C. Mun. Regs. tit. 24, § 2312.1-2.
• Undergo a background check every six years to confirm his continuing compliance with the registration requirements in § 7-2502.03(a). § 7-2502.07a(d).
• Attend a firearms training or safety course providing “a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction.” § 7-2502.03(a)(13)(A).
Second, the plaintiffs challenge the District’s prohibitions of “assault weapon[s],” D.C.Code § 7-2502.02(a)(6), and of magazines holding more than ten rounds of ammunition, § 7-2506.01(b). The FRA defines “assault weapon” to include certain brands and models of semi-automatic rifles, pistols, and shotguns, such as the Colt AR-15 series of rifles, as well as semiautomatic firearms with certain features, regardless of make and model, such as a semi-automatic rifle with a “pistol grip that protrudes conspicuously beneath the action of the weapon” or a “thumbhole stock.” § 7-2501.01(3A)(A). The District also prohibits possession of “any large capacity ammunition feeding device,” which includes “a magazine ... or similar device that has a capacity of ... more than 10 rounds of ammunition.” § 7-2506.01(b) (hereinafter “large-capacity magazines”).
Plaintiffs Mark Snyder and Absalom F. Jordan, Jr. complied with the registration requirements and successfully registered a rifle and a pistol respectively. Plaintiff Jordan, however, was unable to register two additional pistols due to the one-gun-per-30-days limit. Three of the plaintiffs, Dick Anthony Heller, William Carter, and Jordan applied to register semi-automatic rifles, but the MPD denied their applications because it found the firearms were prohibited “assault weapons.” Plaintiff Heller was also denied registration of a pistol because the magazine had a capacity of 15 rounds.*
*1250 Before the district court, the plaintiffs argued all D.C. gun laws are required by the Act of June 30, 1906, ch. 3932, 34 Stat. 808, to be “usual and reasonable,” but contended the aforementioned provisions meet neither criterion or, if they do, then they violate the plaintiffs’ Second Amendment rights. The district court held the challenged laws do not exceed the District’s authority under local law because they are usual and reasonable police regulations within the meaning of the 1906 Act. 698 F.Supp.2d 179, 196-97 (2010). Then, addressing the constitutional challenge, the court determined “the registration requirements plainly implicate the core Second Amendment right” but, applying intermediate scrutiny, upheld the registration scheme in all respects. Id. at 190-93. The court also upheld the ban on assault weapons and large-capacity magazines on the ground that the bans “do not implicate the core Second Amendment right.” Id. at 195. Holding, in the alternative, the bans would survive intermediate scrutiny, id., the court granted summary judgment for the District, and the plaintiffs appealed.
II. Analysis
Pursuant to the principle of constitutional avoidance, we “resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue.” United States v. Wells Fargo Bank, 485 U.S. 351, 354, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988). Accordingly, we consider first whether the D.C. Council had the statutory authority to enact the challenged gun laws.
A. Statutory Authority
The Congress in 1878 permanently established a Board of Commissioners, to which it delegated regulatory authority over the District in discrete areas of policy. Organic Act of June 11, 1878, ch. 180, 20 Stat. 102, 103; see also District of Columbia v. John R. Thompson Co., 346 U.S. 100, 111, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953) (under Organic Act, “municipal government was confined to mere administration” (internal quotation marks omitted)). The Congress passed the 1906 Act in part to grant the Board the specific authority to regulate firearms:
the Commissioners of the District of Columbia are hereby authorized and empowered to make and enforce all such usual and reasonable police regulations ... as they may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia.
Act of June 30, 1906, ch. 3932, § 4, 34 Stat. 808, 809 (emphasis added), amended and codified at D.C.Code § 1-303.43 (referring to “Council” in lieu of “Commissioners”).
In 1973 the Congress passed the District of Columbia Home Rule Act (HRA), see District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (codified as amended at D.C.Code § 1-201.01 et seq.), which remains in effect today. Section 302 of the HRA, D.C.Code § 1-203.02, “Legislative Power,” provides in relevant part:
Except as provided in [certain sections not relevant here], the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this [Act]....
The plaintiffs argue the District’s authority to regulate firearms remains limited by the 1906 Act, and that Act prevents the District from promulgating the gun *1251 laws challenged here. Specifically, the plaintiffs argue the D.C. gun laws are not “usual” because they are not commonly found in either state or federal law and they are also unreasonable. (They maintain the Eighth Amendment case law concerning what is “unusual” should inform our analysis of whether these laws are “usual.”) The District defends the challenged laws as both “usual and reasonable.” It argues a regulation is “usual” if any other jurisdiction has or has had a law addressing similar subject matter.
In any event the District argues, and the United States as amicus curiae agrees, its authority in the HRA over “all rightful subjects of legislation” affirmatively gives it the power to enact the challenged gun laws. The plaintiffs respond to that argument with the observation that the 1906 Act should not be “deemed amended or repealed” because the HRA did not “specifically provide[ ]” for repeal and the 1906 Act is not “inconsistent with” the HRA. See D.C.Code § l-207.17(b) (“No law or regulation which is in force on January 2, 1975 shall be deemed amended or repealed by [the HRA] except to the extent specifically provided herein or to the extent that such law or regulation is inconsistent with this chapter”).
We agree with the District that it was authorized to enact the challenged gun laws. The HRA granted the District broad legislative power, subject to a few express exceptions, none of which is relevant here. See D.C.Code § 1-203.02; id. § 1-204.04(a). The plaintiffs do not contend the District’s authority to enact these gun laws is limited by any other provision of the HRA, see Marijuana Policy Project v. United States, 304 F.3d 82, 83 (D.C.Cir.2002) (HRA “lists certain matters that are not rightful subjects” of legislation, such as “a commuter tax on non-residents’ income”), and the District of Columbia Court of Appeals has authoritatively if more generally said as much, see Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics, 441 A.2d 889, 903 (D.C.1981) (en banc) (Council’s legislative power “limited only by specified exceptions and by the general requirement that legislation be consistent with the U.S. Constitution and the Home Rule Act”). See also John R. Thompson Co., 346 U.S. at 104-05, 110, 73 S.Ct. 1007 (concluding Organic Act of February 21, 1871, 16 Stat. 419, which gave District power over “all rightful subjects of legislation,” conferred authority “as broad as the police power of a state”). Hence we conclude the grant of authority in the HRA comprises the subject of firearms and supersedes the qualified grant to the District in the 1906 Act.
Insofar as the 1906 Act remains effective, it serves only to clarify that the new D.C. Council is the body responsible for the “function” of regulating firearms, as stated in D.C.Code § 1-303.43. Specifically, § 404(a) of the HRA provides
all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan No. 3 of 1967, shall be carried out by the Council in accordance with the provisions of this chapter.
D.C.Code § l-204.04(a). Accordingly, we need not decide whether the laws at issue are “usual and reasonable” because we hold the District has authority under the HRA to enact laws regulating firearms.
B. The Second Amendment
Having determined the District had the statutory authority to promulgate the challenged gun laws, we next consider whether those laws are consistent with the Second Amendment: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and *1252 bear Arms, shall not be infringed.” To determine how we are to approach this question, we begin with Heller.
1. The Heller Decision
In Heller the Supreme Court explained the Second Amendment “codified a preexisting ” individual right to keep and bear arms, 554 U.S. at 592, 128 S.Ct. 2783, which was important to Americans not only to maintain the militia, but also for self-defense and hunting, id. at 599, 128 S.Ct. 2783. Although “self-defense had little to do with the right’s codification [,] it was the central component of the right itself.” Id.
Still, the Court made clear “the right secured by the Second Amendment is not unlimited,” id. at 626, 128 S.Ct. 2783, and it gave some examples to illustrate the boundaries of that right. For instance, the Court noted “the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.” Id. at 625, 128 S.Ct. 2783 (citing United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). This limitation upon the right to keep and bear arms was “supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.” Id. at 627, 128 S.Ct. 2783 (internal quotation marks omitted).
The Court identified other historical limitations upon the scope of the right protected by the Second Amendment. For example, it noted “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.” Id. at 626, 128 S.Ct. 2783. It also provided a list of some “presumptively lawful regulatory measures”:
nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
Id. at 626-27 & n. 26, 128 S.Ct. 2783. The Court made clear, however, it was not “undertaking] an exhaustive historical analysis today of the full scope of the Second Amendment.” Id. at 626, 128 S.Ct. 2783.
2. The Constitutional Framework
Under Heller, therefore, there are certain types of firearms regulations that do not govern conduct within the scope of the Amendment. We accordingly adopt, as have other circuits, a two-step approach to determining the constitutionality of the District’s gun laws. Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir.2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir.2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir.2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir.2010). We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny. See Ezell, 651 F.3d at 701-04; Chester, 628 F.3d at 680; Reese, 627 F.3d at 800-01; Marzzarella, 614 F.3d at 89; see also Nordyke v. King, 644 F.3d 776, 786 (9th Cir.2011) (“only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment”). As explained below, and again in keeping with other circuits, we think that insofar as the laws at issue here do impinge upon a Second *1253 Amendment right, they warrant intermediate rather than strict scrutiny.
With respect to the first step, Heller tells us “longstanding” regulations are “presumptively lawful,” 554 U.S. at 626-27 & n. 26, 128 S.Ct. 2783; that is, they are presumed not to burden conduct within the scope of the Second Amendment. See McDonald v. City of Chicago, — U.S. -, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (Heller “did not cast doubt on [certain types of] longstanding regulatory measures”); Chester, 628 F.3d at 679 (Heller “acknowledged that the scope of the Second Amendment is subject to historical limitations”); Marzzarella, 614 F.3d at 91 (Heller indicates “longstanding limitations are exceptions to the right to bear arms”); United States v. Rene E., 583 F.3d 8, 12 (1st Cir.2009) (Heller “identified limits” of the Second Amendment based upon “various historical restrictions on possessing and carrying weapons”). This is a reasonable presumption because a regulation that is “longstanding,” which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment. A plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right. A requirement of newer vintage is not, however, presumed to be valid.
3. Registration Requirements
To apply this analytical framework, we first consider whether each of the challenged registration requirements impinges upon the right protected by the Second Amendment. We uphold the requirement of mere registration because it is longstanding, hence “presumptively lawful,” and the presumption stands unrebutted. Other registration requirements we remand to the district court, as explained below, for further proceedings.
a. Do the registration requirements impinge upon the Second Amendment right?
The plaintiffs argue the registration requirements are not longstanding and therefore not presumptively lawful, and in fact impermissibly burden the right protected by the Second Amendment. The District responds that registration requirements have been accepted throughout our history, are not overly burdensome, and therefore do not affect the right protected by the Second Amendment.
i. Basic registration requirements
The record supports the view that basic registration of handguns is deeply enough rooted in our history to support the presumption that a registration requirement is constitutional. The Court in Heller considered “prohibitions on the possession of firearms by felons” to be “longstanding” although states did not start to enact them until the early 20th century. See C. Kevin Marshall, Why Can’t Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol’y 695, 708 (2009) (noting “ban on convicts possessing firearms were unknown before World War I” and “compilation of laws in mid-1925 indicated that no State banned possession of long guns based on a prior conviction; that only six banned possession of concealable weapons on such basis; that, except for New York, ... even those laws dated from 1923 or later”). At just about the same time, states and localities began to require registration of handguns.
Registration typically required that a person provide to the local Government a modicum of information about the registrant and his firearm. A 1911 New York *1254 statute delegated the record keeping function to sellers of coneealable firearms, requiring them to “keep a register” recording the “date of sale, name, age, occupation and residence of every purchaser of such a [firearm], together with the calibre, make, model, manufacturer’s number or other mark of identification on such [firearm],” which register had to be “open at all reasonable hours for the inspection of any peace officer.” Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 444-45. Similar laws had already been enacted by Illinois, Act of Apr. 16, 1881, ¶ 90, and Georgia, Act of Aug. 12, 1910, No. 432, § 2, 1910 Ga. Laws 134, 135 (official who grants license to carry pistol or revolver “shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same”). Other states were soon to do so. See Oregon, Act of Feb. 21, 1917, ch. 377, 1917 Or. Laws 804, 805-06; Michigan, Act of June 2, 1927, No. 372, § 9, 1927 Mich. Laws 887, 891 (“any person within this state who owns or has in his possession a pistol” must “present such weapon for safety inspection to the commissioner or chief of police.... A certificate of inspection shall thereupon be issued ... and kept as a permanent official record for a period of six years”). In 1917 California likewise required the purchaser of a coneealable firearm to give the seller basic information about himself, including his name, address, occupation, physical description (height and color of skin, eyes, and hair), and about the weapon (caliber, make, model, number). Act of May 4, 1917, ch. 145, § 7, 1917 Cal. Laws 221, 222-23. Hawaii did the same in 1927, while still a territory, Small Arms Act, Act 206, § 9, 1927 Haw. Laws 209, 211, as did the Congress for the District of Columbia in 1932, see Act of July 8, 1932, ch. 465, § 8, 47 Stat. 650, 652.
In sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the Nation by population.* Therefore, we presume the District’s basic registration requirement, D.C.Code § 7-2502.01(a), including the submission of certain information, § 7-2502.03(b), does not impinge upon the right protected by the Second Amendment. Further, we find no basis in either the historical record or the record of this case to rebut that presumption. Indeed, basic registration requirements are self- *1255 evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous. Cf. Rosario v. Rockefeller, 410 U.S. 752, 754-58, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (law “requiring] a voter to enroll in the party of his choice at least 30 days before the general election in November in order to vote in the next subsequent party primary” does not violate First and Fourteenth Amendments because “if [the petitioners’] plight [could] be characterized as disenfranchisement at all, it was not caused by [the law], but by their own failure to take timely steps to effect their enrollment”); id. at 760, 93 S.Ct. 1245 (“the State is certainly justified in imposing some reasonable cutoff point for registration or party enrollment, which citizens must meet in order to participate in the next election”); Justice v. Town of Cicero, 577 F.3d 768, 773-74 (7th Cir.2009) (“ordinance requiring the registration of all firearms ... appears to be consistent with the ruling in Heller”). These early registration requirements, however, applied with only a few exceptions solely to handguns — that is, pistols and revolvers— and not to long guns. Consequently, we hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic.
ii. Novel registration requirements
Several other of the District’s registration requirements are not longstanding, including the ballistics-identification provision, D.C.Code § 7-2502.03(d), the one-pistol-per-30-days rule, § 7-2502.03(e), and the requirements that applicants appear in person, § 7-2502.04(c), and re-register each firearm after three years, § 7-2502.07a(a)-(c). Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant demonstrate knowledge about firearms, § 7-2502.03(a)(10), be fingerprinted and photographed, § 7-2502.04(a)-(b), take a firearms training or safety course, § 7-2502.03(a)(13)(A), meet a vision requirement, § 7-2502.03(a)(11), and submit to a background check every six years, § 7-2502.07a(d).*
The requirements that are not longstanding, which include, in addition to those listed in the prior paragraph, all the requirements as applied to long guns, also affect the Second Amendment right because they are not de minimis.** All of these requirements, such as the mandatory five hours of firearm training and instruction, § 7-2502.03(a)(13)(A), make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home — the “core lawful purpose” protected by the Second Amendment, Heller, 554 U.S. at 630, 128 S.Ct. 2783. Because they impinge upon that right, we must determine whether these requirements are *1256 constitutional.* In order to do that, however, we must first determine the degree of scrutiny to which they are appropriately subject.
b. Intermediate scrutiny is appropriate
The plaintiffs argue strict scrutiny is the appropriate standard of review because, in holding the Fourteenth Amendment made the Second Amendment applicable to the States, the Court in McDonald described the right “to keep and bear arms [as] among those fundamental rights necessary to our system of ordered liberty,” 130 S.Ct. at 3042. The District responds that strict scrutiny would be inappropriate because, among other reasons, the right to keep and carry arms has always been heavily regulated; it argues we should adopt a “reasonable-regulation test.” The plaintiffs, in turn, contend Heller forecloses a “reasonableness” test.
Heller clearly does reject any kind of “rational basis” or reasonableness test, see 554 U.S. at 628 n. 27, 128 S.Ct. 2783, but it leaves open the question what level of scrutiny we are to apply to laws regulating firearms. True, the Supreme Court often applies strict scrutiny to legislation that impinges upon a fundamental right. See, e.g., Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (“classifications affecting fundamental rights are given the most exacting scrutiny” (citation omitted)). In applying strict scrutiny, the Court requires the Government to prove its law “furthers a compelling interest and is narrowly tailored to achieve that interest.” Citizens United v. FEC, — U.S. -, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (internal quotation marks omitted). The Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (applying intermediate scrutiny to restrictions on “time, place, or manner of protected speech”); Marzzarella, 614 F.3d at 96 (“Strict scrutiny does not apply automatically any time an enumerated right is involved”); Chester, 628 F.3d at 682 (“We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights”); Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 697-98, 700 (2007) (“mere fact of ‘fundamentality’ does not answer the question of what would be the appropriate standard of review for the right to bear arms” as “many of the individual rights in the Bill of Rights do not trigger strict scrutiny, including many that are incorporated,” and “[e]ven among those incorporated rights that do prompt strict scrutiny, such as the freedom of speech and of religion, strict scrutiny is only occasionally applied”). Cf. Mills v. Habluetzel, 456 U.S. 91, 98-99, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) (disabilities attendant to illegitimacy are constitutional “to the extent they are substantially related to a legitimate state interest”); Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (“classifications by gender must serve important governmental *1257 objectives and must be substantially related to achievement of those objectives”).
As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely “depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.” Chester, 628 F.3d at 682; see also Turner Broad. Sys., Inc. v. FCC (Turner I), 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (“regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue” (citation omitted)); Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (“We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.”); Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L. Rev. 1343, 1376 (2009) (“The case law dealing with free speech and the free exercise of religion provides a particularly good analogue” for Second Amendment). That is, a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify. See Turner I, 512 U.S. at 661, 114 S.Ct. 2445 (“must-carry provisions do not pose such inherent dangers to free expression ... as to justify application of the most exacting level of First Amendment scrutiny”; rather, “the appropriate standard ... is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech”); Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (“commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values” (internal quotation marks omitted)); Buckley v. Valeo, 424 U.S. 1, 44-45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (“expenditure limitations” are subject to “exacting scrutiny applicable to limitations on core First Amendment rights of political expression” because they impose a “great[] burden on basic freedoms”); Ezell, 651 F.3d at 703 (level of scrutiny “will depend on how close the law comes to the core of the Second Amendment right and the severity of the law’s burden on the right”); see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1471 (2009) (“Ballot access regulations are ... subject to strict scrutiny if they ‘impose a severe burden on associational rights,’ but to a much weaker level of scrutiny if they ‘impose[ ] only modest burdens’ ” (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 128 S.Ct. 1184, 1191-92, 170 L.Ed.2d 151 (2008))); Winkler, supra, at 698 (“Strict scrutiny ... does not apply to fundamental, preferred rights when the courts determine that the underlying burden is only incidental”).
As between strict and intermediate scrutiny, we conclude the latter is the more appropriate standard for review of gun registration laws. As the Third Circuit reasoned in Marzzarella with regard to a prohibition on possession of a firearm with the serial numbers obliterated, registration requirements “do[ ] not severely limit the possession of firearms.” 614 F.3d at 97. *1258 Indeed, none of the District’s registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose.
c. Intermediate scrutiny requires remand
As for the novel registration requirements, to pass muster under intermediate scrutiny the District must show they are “substantially related to an important governmental objective.” Clark, 486 U.S. at 461, 108 S.Ct. 1910; see also United States v. Williams, 616 F.3d 685, 692-94 (7th Cir.2010) (prohibition of firearm possession by felons survives intermediate scrutiny). That is, the District must establish a tight “fit” between the registration requirements and an important or substantial governmental interest, a fit “that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.” Fox, 492 U.S. at 480, 109 S.Ct. 3028; see also Ward, 491 U.S. at 782-83, 109 S.Ct. 2746 (“The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest”). We think the District has advanced, albeit incompletely — almost cursorily — articulated, two important governmental interests it may have in the registration requirements, viz., to protect police officers and to aid in crime control. Cf. United States v. Salerno, 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (“the Government’s general interest in preventing crime is compelling”). The Council Committee on Public Safety explained: “Registration is critical because it ... allows officers to determine in advance whether individuals involved in a call may have firearms ... [and] assists law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class.”* Report on Bill 17-843, at 3-4 (Nov. 25, 2008).
We cannot conclude, however, that the novel registration requirements — or any registration requirement as applied to long guns — survive intermediate scrutiny based upon the record as it stands because the District has not demonstrated a close fit between those requirements and its governmental interests. In support of the registration requirements, the District relies upon the Committee Report on the FRA, along with testimony and written statements submitted to the Committee at public hearings. Even so, the record is inadequate for us confidently to hold the registration requirements are narrowly tailored.
For example, the Committee Report asserts “studies show” that “laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states,” and that “handguns sold in multiple sales to the *1259 same individual purchaser are frequently used in crime.” Id. at 10. The Report neither identifies the studies relied upon nor claims those studies showed the laws achieved their purpose, nor in any other way attempts to justify requiring a person who registered a pistol to wait 30 days to register another one. The record does include testimony that offers cursory rationales for some other requirements, such as safety training and demonstrating knowledge of gun laws, see, e.g., Testimony of Cathy L. Lanier, Chief of Police, at 2 (Oct. 1, 2008), but the District fails to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked (perhaps because it was relying upon the asserted interests we have discounted as circular).
Although we do “accord substantial deference to the predictive judgments” of the legislature, Turner Broad. Sys., Inc. v. FCC (Turner II), 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (quoting Turner I, 512 U.S. at 665, 114 S.Ct. 2445) (internal quotation marks omitted), the District is not thereby “insulated from meaningful judicial review,” Turner I, 512 U.S. at 666, 114 S.Ct. 2445 (controlling opinion of Kennedy, J.); see also City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion) (citing Turner I and “acknowledging] that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems”). Rather, we must “assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.” Turner II, 520 U.S. at 195, 117 S.Ct. 1174 (quoting Turner I, 512 U.S. at 666, 114 S.Ct. 2445) (internal quotation marks omitted). Therefore, the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments. On the present record, we conclude the District has not supplied evidence adequate to show a substantial relationship between any of the novel registration requirements and an important governmental interest.
Nor, however, do the plaintiffs present more meaningful contrary evidence concerning handguns, and neither the District nor the plaintiffs present any evidence at all concerning application of the registration requirements to long guns. The parties’ mutual failure in their briefs to distinguish between handguns and long guns points up a significant deficiency in the present record.* The Committee Report implicitly acknowledged the distinction between handguns and long guns only backhandedly, quoting Heller to emphasize specifically “the problem of handgun violence in this country” before discussing the proposed FRA. Report on Bill 17-843, at 3 (Nov. 25, 2008). Handguns indeed appear to have been the exclusive subject of the Committee’s concern. Nowhere in the Report is there even a single reference to the need for registration of rifles or shotguns. For all the legislative record and the record in this case reveal, the provisions of the FRA that deal specifically with registration of long guns might have been written in invisible ink.
In the light of these evidentiary deficiencies and “the importance of the issues” at stake in this case, taking our cue from the Supreme Court in Turner I, we *1260 believe the parties should have an opportunity “to develop a more thorough factual record.” 512 U.S. at 664-68, 114 S.Ct. 2445 (controlling opinion of Kennedy, J.). In Turner I, the Court had determined intermediate scrutiny was appropriate for the First Amendment challenge at issue. “On the state of the record developed [that] far,” however, the Government was unable to show the law was narrowly tailored. Id. at 665, 114 S.Ct. 2445. Rather than invalidate a legislative judgment based upon that shortcoming, the Court remanded the case for development of “a more thorough factual record.” Id. at 668, 114 S.Ct. 2445. We follow suit by remanding the novel registration requirements, and all registration requirements as applied to long guns, to the district court for further evidentiary proceedings.
4. Assault Weapons and Large-Capacity Magazines
Because the plaintiffs fail to present an argument in their briefs questioning the constitutionality of the ban on semiautomatic pistols and shotguns, see page 1249 footnote* above, we construe the plaintiffs’ challenge to the ban on assault weapons as going only to the prohibition of certain semi-automatic rifles. We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity.* For the court to determine whether these prohibitions are constitutional, therefore, we first must ask whether they impinge upon the right protected by the Second Amendment. That is, prohibiting certain arms might not meaningfully affect “individual self-defense, [which] is ‘the central component’ of the Second Amendment right.” McDonald, 130 S.Ct. at 3036, 130 S.Ct. 3020 (quoting Heller, 554 U.S. at 599, 128 S.Ct. 2783). Of course, the Court also said the Second Amendment protects the right to keep and bear arms for other “lawful purposes,” such as hunting, but self-defense is the “core lawful purpose” protected, Heller, 554 U.S. at 630, 128 S.Ct. 2783.
The Court in Heller, as mentioned above at page 1252, recognized yet another “limitation on the right to keep and carry arms,” namely that the “sorts of weapons protected” are those “ ‘in common use at the time’ for lawful purposes like self-defense.” Id. at 624, 627, 128 S.Ct. 2783. The Court found this limitation “fairly supported by the historical tradition of prohibiting the carrying of ‘dangerous and unusual weapons.’ ” Id. at 627, 128 S.Ct. 2783. Because the prohibitions at issue, unlike the registration requirements, apply only to particular classes of weapons, we must also ask whether the prohibited weapons are “typically possessed by law-abiding citizens for lawful purposes,” id. at 625, 128 S.Ct. 2783; if not, then they are not the sorts of “Arms” protected by the Second Amendment.
a. Do the prohibitions impinge upon the Second Amendment right?
The plaintiffs contend semi-automatic rifles, in particular the AR variants, are commonly possessed for self-protection in the home as well as for sport. They also argue magazines holding more than ten rounds are commonly possessed for self-defense and for other lawful purposes and that the prohibition of such magazines *1261 would impose a burden upon them. Specifically, they point out that without a large-capacity magazine it would be necessary, in a stressful situation, to pause in order to reload the firearm.
The District, by contrast, argues neither assault weapons nor weapons with large-capacity magazines are among the “Arms” protected by the Second Amendment because they are both “dangerous and unusual,” Heller, 554 U.S. at 627, 128 S.Ct. 2783 (internal quotation marks omitted), and because prohibiting them minimally burdens the plaintiffs; hence the District maintains the bans are constitutional. The Committee on Public Safety received evidence that assault weapons are not useful for the purposes of sporting or self-defense, but rather are “military-style” weapons designed for offensive use. See generally Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence (Oct. 1, 2008). The Committee concluded assault weapons “have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations.” Report on Bill 17-843, at 7 (Nov. 25, 2008).
The District likewise contends magazines holding more than ten rounds are disproportionately involved in the murder of law enforcement officers and in mass shootings, and have little value for self-defense or sport. It cites the Siebel testimony, which relies upon a report of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) stating that semi-automatic rifles with large-capacity magazines are not suitable for sporting purposes. The District also reasons that the usefulness of large-capacity magazines for self-defense in rare circumstances does not mean the burden imposed upon the plaintiffs is more than minimal.
We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in “common use,” as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market. As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten.
Nevertheless, based upon the record as it stands, we cannot be certain whether these weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions of certain semi-automatic rifles and magazines holding more than ten rounds meaningfully affect the right to keep and bear arms. We need not resolve that question, however, because even assuming they do impinge upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.
b. Intermediate scrutiny is appropriate
As we did in evaluating the constitutionality of certain of the registration requirements, we determine the appropriate standard of review by assessing how severely the prohibitions burden the Second Amendment right. Unlike the law held unconstitutional in Heller, the laws at issue here do not prohibit the possession of “the *1262 quintessential self-defense weapon,” to wit, the handgun. 554 U.S. at 629, 128 S.Ct. 2783. Nor does the ban on certain semiautomatic rifles prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun. See Gary Kleck & Marc Gertz, Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun, 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semiautomatic pistols are together used almost 80% of the time in incidents of self-defense with a gun); Dep’t of Treasury, Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles 88 (1998) (semiautomatic assault rifles studied are “not generally recognized as particularly suitable for or readily adaptable to sporting purposes”). Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right. As the District points out, the plaintiffs present hardly any evidence that semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport. Cf. Kleck & Gertz, supra, at 177 (finding that of 340,000 to 400,000 instances of defensive gun use in which the defenders believed the use of a gun had saved a life, 240,000 to 300,000 involved handguns). Accordingly, we believe intermediate rather than strict scrutiny is the appropriate standard of review.
In this we agree with the reasoning of the Third Circuit in Marzzarella. The court there applied intermediate scrutiny to the prohibition of unmarked firearms in part because it thought the ban was similar to a regulation “of the manner in which ... speech takes place,” a type of regulation subject to intermediate scrutiny “under the time, place, and manner doctrine” of the First Amendment. 614 F.3d at 97. Notably, because the prohibition left a person “free to possess any otherwise lawful firearm,” the court reasoned it was “more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights.” Id. Here, too, the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves. See Volokh, supra, at 1471 (“where content-neutral speech restrictions are involved, restrictions that impose severe burdens' (because they don’t leave open ample alternative channels) must be judged under strict scrutiny, but restrictions that impose only modest burdens (because they do leave open ample alternative channels) are judged under a mild form of intermediate scrutiny”).
c. The prohibitions survive intermediate scrutiny
Recall that when subject to intermediate scrutiny the Government has the burden of showing there is a substantial relationship or reasonable “fit” between, on the one hand, the prohibition on assault weapons and magazines holding more than ten rounds and, on the other, its important interests in protecting police officers and controlling crime. The record evidence substantiates that the District’s prohibition is substantially related to those ends.
The Committee on Public Safety relied upon a report by the ATF, which described assault weapons as creating “mass produced mayhem.” Assault Weapons Profile 19 (1994). This description is elaborated in the Siebel testimony for the Brady Center: “the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly” and “[p]istol *1263 grips on assault rifles ... help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position.” The same source also suggests assault weapons are preferred by criminals and place law enforcement officers “at particular risk ... because of their high firepower,” as does the ATF, see Dep’t of Treasury, Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles 34-35, 38 (1998). See also Christopher S. Koper et al., U. Penn. Jerry Lee Ctr. of Criminology, An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1991-2003, at 51, 87 (2004) (assault weapons “account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful,” and “criminal use of [assault weapons] ... declined after” the federal assault weapons ban enacted in 1994 “independently of trends in gun crime”); id. at 11 (“AR-15 type rifles are civilian weapons patterned after the U.S. military’s M-16 rifle and were the assault rifles most commonly used in crime before the ban” in federal law from 1994 to 2004).
Heller suggests “M-16 rifles and the like” may be banned because they are “dangerous and unusual,” see 554 U.S. at 627, 128 S.Ct. 2783. The Court had previously described the “AR-15” as “the civilian version of the military’s M-16 rifle.” Staples v. United States, 511 U.S. 600, 603, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Although semi-automatic firearms, unlike automatic M-16s, fire “only one shot with each pull of the trigger,” id. at 602 n. 1, 114 S.Ct. 1793, semi-automatics still fire almost as rapidly as automatics. See Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, at 1 (Oct. 1, 2008) (“30-round magazine” of UZI “was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic”). Indeed, it is difficult to draw meaningful distinctions between the AR-15 and the M-16. See Staples, 511 U.S. at 603, 114 S.Ct. 1793 (“Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon”); Koper, supra, at 4 (AR-15 and other federally banned assault weapons “are civilian copies of military weapons and accept ammunition magazines made for those military weapons”). In short, the evidence demonstrates a ban on assault weapons is likely to promote the Government’s interest in crime control in the densely populated urban area that is the District of Columbia. See Comm, on Pub. Safety, Report on Bill 17-593, at 4 (Nov. 25, 2008) (“The District shares the problem of gun violence with other dense, urban jurisdictions”).
The record also supports the limitation on magazine capacity to ten rounds. The Committee relied upon Siebel’s testimony that “[t]he threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines” because, “[b]y permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters.” See also Koper, supra, at 87 (“guns used in shootings are 17% to 26% more likely to have [magazines holding more than ten rounds] than guns used in gunfire cases resulting in no wounded victims”); id. at 97 (“studies ... suggest that attacks with semi-automatics — including [assault weapons] and other semi-automatics with [magazines holding more than ten rounds]— result in more shots fired, persons wounded, and wounds per victim than do other gun attacks”). The Siebel testimony moreover supports the District’s claim that high-capacity magazines are dangerous in self-defense situations because “the ten *1264 dency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.” Moreover, the Chief of Police testified the “2 or 3 second pause” during which a criminal reloads his firearm “can be of critical benefit to law enforcement.” Overall the evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers, which supports the District’s claim that a ban on such magazines is likely to promote its important governmental interests.
We conclude the District has carried its burden of showing a substantial relationship between the prohibition of both semiautomatic rifles and magazines holding more than ten rounds and the objectives of protecting police officers and controlling crime. Accordingly, the bans do not violate the plaintiffs’ constitutional right to keep and bear arms.
III. Conclusion
For the reasons stated above, we affirm the judgment of the district court with respect, first, to the requirement of mere registration as applied to handguns and expressed in D.C.Code §§ 7-2502.01(a) and 7-2502.03(b), and second, to the ban on “assault weapons” and large-capacity magazines, as they are defined in §§ 7-2502.02(a)(6), 7-2501.01(3A)(A)(i)(I), (IV), and 7-2506.01(b). With respect to the registration requirements in §§ 7-2502.03(a)(10), 7-2502.03(a)(ll), 7-2502.03(a)(13)(A), 7-2502.03(d), 7-2502.03(e), 7-2502.04, and 7-2502.07a, and all the registration requirements (including §§ 7-2502.01(a) and 7-2502.03(b)) as applied to long guns, see Part II.B.3.C, the judgment is vacated and this matter is remanded to the district court for further proceedings consistent with this opinion.

So ordered.

Appendix: Regarding the Dissent
Our colleague has issued a lengthy dissenting opinion explaining why he would strike down both the District’s registration requirements and its ban on semi-automatic rifles. We respond to his main arguments below.
A. Interpreting Heller and McDonald
A substantial portion of the dissent is devoted to arguing Heller and McDonald preclude the application of heightened (intermediate, or for that matter, strict) scrutiny in all Second Amendment cases. The dissent reasons that Heller rejected balancing tests and that heightened scrutiny is a type of balancing test. As we read Heller, the Court rejected only Justice Breyer’s proposed “interest-balancing” inquiry, which would have had the Court ask whether the challenged statute “burdens a protected interest in a way or to an extent that is out of proportion to the statute’s salutary effects upon other important governmental interests.” 554 U.S. at 689-90, 128 S.Ct. 2783 (Breyer J., dissenting). That is, Justice Breyer, rather than ask merely whether the Government is promoting an important interest by way of a narrowly tailored means, as we do here, would have had courts in Second Amendment cases decide whether the challenged statute “imposes burdens that, when viewed in light of the statute’s legitimate objectives, are disproportionate.” Id. at 693, 128 S.Ct. 2783. Thus, although Justice Breyer would have had us assess whether the District’s handgun ban “further[s] the sort of life-preserving and public-safety interests that the Court has called ‘compelling,’” id. at 705, 128 S.Ct. 2783 (citation omitted), the key to his “interest-balancing” approach was “proportionality”; that is, he would have had us weigh this governmental interest against “the extent to which the District’s law *1265 burdens the interests that the Second Amendment seeks to protect,” id. at 706, 128 S.Ct. 2783.
Our dissenting colleague asserts (at 1282) heightened scrutiny is also “a form of interest balancing” and maintains that strict and intermediate scrutiny “always involve at least some assessment 'of whether the law in question is sufficiently important to justify infringement on an individual constitutional right.” Although, as he points out, the Supreme Court has in a few opinions applying heightened scrutiny— out of scores if not hundreds of such opinions — used the word “balance,” heightened scrutiny is clearly not the “interest-balancing inquiry” proposed by Justice Breyer and rejected by the Court in Heller. The - Court there said, Justice Breyer’s proposal did not correspond to any of “the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis),” 554 U.S. at 634, 128 S.Ct. 2783, but was rather “a judge-empowering ‘interest-balancing inquiry'” that would have a court weigh the asserted governmental interests against the burden the Government would place upon exercise of the Second Amendment right, a balancing that is not part of either strict or intermediate scrutiny.
The dissent further contends McDonald confirms the Supreme Court’s rejection of heightened scrutiny in Second Amendment cases because a plurality of the Court there said “Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise.” 130 S.Ct. at 3050. That observation was clearly and specifically directed to Justice Breyer’s interest-balancing inquiry, as the very next sentence shows: “As we have noted, while his opinion in Heller recommended an interest-balancing test, the Court specifically rejected that suggestion.” Id. Moreover, strict and intermediate scrutiny do not, as the dissent asserts (at 1278), “obviously require assessment of the ‘costs and benefits’ of government regulations.” Rather, they require an assessment of whether a particular law will serve an important or compelling governmental interest; that is not a comparative judgment.
If the Supreme Court truly intended to rule out any form of heightened scrutiny for all Second Amendment cases, then it surely would have said at least something to that effect. Cf. Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783 (expressly rejecting rational basis review). The Court did not say anything of the sort; the plaintiffs in this case do not suggest it did; and the idea that Heller precludes heightened scrutiny has eluded every circuit to have addressed that question since Heller was issued. See First Circuit: United States v. Booker, 644 F.3d 12, 25 (2011) (requiring “a substantial relationship between the restriction and an important governmental objective”); Third Circuit: Marzzarella, 614 F.3d at 97 (applying intermediate scrutiny); Fourth Circuit: United States v. Masciandaro, 638 F.3d 458, 471 (2011) (same); Chester, 628 F.3d at 683 (same); id. at 690 (Davis, J., concurring) (same); Seventh Circuit: Ezell, 651 F.3d at 709 (applying “more rigorous showing” than intermediate scrutiny, “if not quite ‘strict scrutiny’ ”); id. at 712-14 (Rovner J., concurring) (endorsing intermediate scrutiny); Williams, 616 F.3d at 692-93 (applying intermediate scrutiny); United States v. Skoien, 614 F.3d 638, 641-42 (2010) (en banc) (upholding law upon assumption intermediate scrutiny applies); Ninth Circuit: Nordyke, 644 F.3d at 786 n. 9 (reserving “precisely what type of heightened scrutiny applies to laws that substantially *1266 burden Second Amendment rights”); id. at 795 (Gould J., concurring in part, “would subject to heightened scrutiny only arms regulations falling within the core purposes of the Second Amendment” and “would subject incidental burdens on the Second Amendment right ... to reasonableness review”); Tenth Circuit: Reese, 627 F.3d at 802 (applying intermediate scrutiny).
The dissent (at 1284-85) takes us to task for suggesting a restriction on a core enumerated constitutional right can be subjected to intermediate scrutiny. This assertion, true or false, is simply misplaced; we apply intermediate scrutiny precisely because the District’s laws do not affect the core right protected by the Second Amendment. See supra at 1256-57, 1261— 62.
Unlike our dissenting colleague, we read Heller straightforwardly: The Supreme Court there left open and untouched even by implication the issue presented in this case. The Court held the ban on handguns unconstitutional without at the same time adopting any particular level of scrutiny for Second Amendment cases because it concluded that “[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one’s home and family would fail constitutional muster.” Id. at 628-29, 128 S.Ct. 2783 (internal quotation marks and citation omitted); McDonald, 130 S.Ct. at 3036 (quoting Heller, 554 U.S. at 628-30, 128 S.Ct. 2783). Nothing in Heller suggests a case involving a restriction significantly less severe than the total prohibition of handguns at issue there could or should be resolved without reference to one or another of the familiar constitutional “standards of scrutiny.” On the contrary, the Supreme Court was explicit in cautioning that because Heller was its “first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field.” Heller, 554 U.S. at 635, 128 S.Ct. 2783; see also, e.g., Ezell, 651 F.3d at 703 (with the exception of “broadly prohibitory laws restricting the core Second Amendment right,” courts are “left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights”); Chester, 628 F.3d at 682 (“Heller left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context”); Volokh, supra, at 1456 (“The Court [in Heller ] did not discuss what analysis would be proper for less ‘severe’ restrictions, likely because it had no occasion to”).
Having rejected the possibility of heightened scrutiny, the dissent (at 1285) goes on to find in Heller this proposition: “Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right.” We do not see this purportedly “up-front” test “announced” anywhere in the Court’s opinion. The Court in Heller said certain “longstanding” regulations are “presumptively lawful,” 554 U.S. at 626-27 & n. 26, 128 S.Ct. 2783, but it nowhere suggested, nor does it follow logically, that a regulation must be longstanding or “rooted in text, history, and tradition” in order to be constitutional. As we have said, the Court struck down the handgun ban because it so severely restricted the core Second Amendment right of self-defense in the home that it “would fail consti *1267 tutional muster” under any standard of scrutiny. Likewise, the Court invalidated the District’s requirement that handguns “in the home be rendered and kept inoperable” because that requirement “makes it impossible for citizens to use them for the core lawful purpose of self-defense.” Id. at 630, 128 S.Ct. 2783. The Court in Heller did consider whether there were historical analogues to the handgun ban, but only to note, primarily in response to Justice Breyer’s dissent, that because earlier laws were far less restrictive, they did not support the constitutionality of a ban on handguns. See id. at 632, 128 S.Ct. 2783 (“Nothing about [the] fire-safety laws” cited by Justice Breyer “undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns”); id. (“other founding-era laws” cited by Justice Breyer “provide no support for the severe restriction in the present case”). In any event, we think it clear Heller did not announce the “up-front” test applicable to all Second Amendment cases that our dissenting colleague goes to great lengths to “divine” from that opinion.
In sum, Heller explicitly leaves many questions unresolved and says nothing to cast doubt upon the propriety of the lower courts applying some level of heightened scrutiny in a Second Amendment challenge to a law significantly less restrictive than the outright ban on all handguns invalidated in that case. Although Heller renders longstanding regulations presumptively constitutional, it nowhere suggests a law must be longstanding or rooted in text, history, and tradition to be constitutional.
B. Registration Requirements
Our dissenting colleague contends (at 1294) the historical registration laws we cite do not support the District’s basic registration requirement because to rely upon those laws as historical precedents “is to conduct the Heller analysis at an inappropriately high level of generality.” In fact, however, the historical regulations and the District’s basic registration requirement are not just generally alike, they are practically identical: They all require gun owners to give an agent of the Government basic information about themselves and their firearm.
In any event, we do not decide, but rather remand to the district court, the question whether the District’s novel registration requirements and all its registration requirements as applied to long guns withstand intermediate scrutiny. See supra at 1260. Accordingly, those registration requirements will be deemed constitutional only if the District shows they serve its undoubtedly important governmental interests in preventing crimes and protecting police officers.
C. Assault Weapons
In arguing Heller requires holding unconstitutional the District’s ban on certain semi-automatic rifles, the dissent relies heavily upon the idea that Heller held possession of semi-automatic handguns is “constitutionally protected.” The Court’s holding in Heller was in fact narrower, condemning as unconstitutional a prohibition of all handguns, that is, a ban on the “entire class of ‘arms’ that is overwhelmingly chosen by American society for [the] lawful purpose” of self-defense. 554 U.S. at 628, 128 S.Ct. 2783. A narrower prohibition, such as a ban on certain semiautomatic pistols, may also “fail constitutional muster,” id., but that question has not yet been decided by the Supreme Court.* Therefore, the dissent (at 1286) *1268 mischaracterizes the question before us as whether “the Second Amendment protects semi-automatic handguns but not semiautomatic rifles.” The dissent at (1289 n. 16) insists it is “implausible” to read Heller as “protecting] handguns that are revolvers but not handguns that are semi-automatic.” We do not, however, hold possession of semi-automatic handguns is outside the protection of the Second Amendment. We simply do not read Heller as foreclosing every ban on every possible sub-class of handguns or, for that matter, a ban on a sub-class of rifles. See Marzzarella, 614 F.3d at 101 (upholding prohibition on possession of handguns with serial numbers obliterated); cf. Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U.L. Rev. 375, 422 (2009) (Heller “avoided— perhaps in part because it had little cause to consider — categorization at the level of classification: that is, the creation of subcategories that may warrant only intermediate protection”).**
The dissent, indulging us by assuming some level of heightened scrutiny applies, maintains (at 1288) “D.C. cannot show a compelling interest in banning semi-automatic rifles.” Why not? “[B]ecause the necessary implication of the decision in Heller is that D.C. could not show a sufficiently compelling interest to justify its banning semi-automatic handguns.” That conclusion, however, is neither to be found in nor inferred from Heller. As we explain above, the Court in Heller held the District’s ban on all handguns would fail constitutional muster under any standard of scrutiny because the handgun is the “quintessential” self-defense weapon. See 554 U.S. at 629, 128 S.Ct. 2783 (“There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the *1269 police”). The same cannot be said of semiautomatic rifles.
Finally, in criticizing our application of intermediate scrutiny to the ban on assault weapons, our dissenting colleague says (at 1286, 1290) “it is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns” “because handguns can be concealed.” It is not our place, however, to determine in the first instance whether banning semi-automatic rifles in particular would promote important law-enforcement objectives. Our role is narrower, viz., to determine whether the District has presented evidence sufficient to “establish the reasonable fit we require” between the law at issue and an important or substantial governmental interest. Fox, 492 U.S. at 480, 109 S.Ct. 3028.

 Although the District revised its regulatory scheme, the ban on semi-automatic rifles and the registration scheme themselves are not entirely new. The District has banned all semi-automatic firearms shooting more than twelve shots without reloading and has required basic registration since 1932. See Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652. It enacted most of its comprehensive registration scheme in 1975. See Firearms Control Regulations Act of 1975, D.C. Law 1-85.

 The plaintiffs also challenge several administrative and enforcement provisions incidental to the underlying regime. See D.C.Code §§ 7-2502.03(d), 7-2502.05(b), D.C. Mun. Regs. tit. 24, § 2320 (fees for registration, ballistics testing, and fingerprinting); D.C.Code § 7-2507.06 (violation punishable by fine of up to $1,000, one year in prison, or both); § 7-2502.08 (registrant must notify MPD if firearm is transferred, lost, stolen, or destroyed, and exhibit registration certificate upon demand of MPD). These provisions are lawful insofar as the underlying regime is lawful and hence enforceable.

 In their complaint, the plaintiffs challenge the constitutionality of the FRA insofar as it bans all "assault weapons,” including semi-automatic rifles, pistols, and shotguns. In their briefs, however, they recount no attempt to register a semi-automatic pistol or a semiautomatic shotgun of a kind prohibited by the District’s ban on assault weapons, nor do they mention such weapons in arguing the ban is unconstitutional. Accordingly, we take their challenge to the ban on assault weapons as referring only to the ban on semi-automatic rifles, as set out in D.C.Code § 7-2501.0 1(3A)(A)(i)(I) and (IV). See Summers v. Earth Island Inst., 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009) (standing doctrine “requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction,” and the plaintiff “bears the burden of showing that he has standing for each type of relief sought” (internal quotation marks omitted)); Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm’n, *1250 485 F.2d 786, 790 n. 16 (D.C.Cir.1973) (declining to consider claims because "[i]n their brief ... petitioners offer no argument whatever in support of these points”).

 Today seven states require registration of some or all firearms, including Hawaii, Haw. Rev.Stat. § 134-3(a), (b), (e) (registration of all firearms); California, Cal.Penal Code § 11106(c) (registration for sales of handguns); Michigan, Mich. Comp. Laws § 28.422(5) (purchaser must provide information to obtain "license” for each pistol); New Jersey, NJ.Rev.Stat. 2C:58-12 (registration of assault firearms); Louisiana, La.Rev.Stat. Ann. § 40:1783 (registration of firearms); Maryland, Md.Code Ann., Crim. Law § 4-303 (registration of pre-ban assault pistols); and Connecticut, Conn. Gen.Stat. § 53-202d(a) (registration of pre-ban assault weapons); as do some cities and counties, including Chicago, Municipal Code § 8-20-140 et seq. (registration of all firearms); New York City, Admin. Code, § 10-304(a), (f) (registration of rifles and shotguns); Las Vegas, Mun. Code § 10.66.140 (registration of handguns); Omaha, Mun. Code § 20-251 (registration of "any coneealable firearm”); Cleveland, Offenses & Bus. Activities Code §§ 674.02, 674.05 (registration card required for each handgun) (but preempted by Ohio Rev.Code Ann. § 9.68(A)); and Clark County, Nevada, Code § 12.04.110 (registration of handguns). Moreover, several states require sellers to report to law enforcement information about firearm sales identifying the purchaser and the firearm. See Legal Cmty. Against Violence, Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Guns Laws, 253 (Feb. 2008), http://www.lcav. org/publications-briefs/reports_analyses/Reg Guns.entire.report.pdf (identifying ten states).

 Although some types of licensure have been required by some states since the early 20th century, see, e.g., Act of Apr. 6, 1909, ch. 114, § 3, 1909 N.H. Laws 451, 451-52 (license "to carry a loaded pistol or revolver”); Small Arms Act, Act 206, §§ 5, 7, 1927 Haw. Laws 209, 209-11 (license to carry a pistol or revolver outside the home), the District’s particular requirements are novel, not longstanding.

 The requirement of basic registration as applied to long guns may also be de minimis. For now, however, we assume this requirement, too, impinges upon the Second Amendment right because, as we discuss below, the record is devoid of information concerning the application of registration requirements to long guns. On remand and with the benefit of additional evidence, the district court will be better able to address this question in the first instance.

 We note that some of the plaintiffs' arguments — in particular with respect to the provisions requiring registrants to demonstrate knowledge about firearms, meet a vision standard, and take a training course — are so cursory we might, in other circumstances, consider them forfeit. See United States v. Law, 528 F.3d 888, 908 n. 11 (D.C.Cir.2008) (appellant’s argument forfeited “because he failed to develop it”). As we will in any event be remanding other registration requirements to the district court, however, see Part II. B.3.c, we see no reason to foreclose these particular plaintiffs from fleshing out their arguments as well as supplementing the record, if they can.

 On remand, the District will have an opportunity to explain in greater detail how these governmental interests are served by the novel registration requirements. The Committee also thought registration useful because it "gives law enforcement essential information about firearm ownership, ... permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.” Report on Bill 17-843, at 3-4 (Nov. 25, 2008). These rationales are circular, however, and do not on their own establish either an important interest of the Government or a substantial relationship between the registration of firearms and an important interest.

 While the Court in Heller observed that the handgun is "the quintessential self-defense weapon,” 554 U.S. at 629, 128 S.Ct. 2783, a rifle or shotgun is the firearm of choice for hunting, which activity Heller recognized as providing one basis for the right to keep and bear arms, albeit not the central one, id. at 599, 128 S.Ct. 2783.

 We know of only two exceptions: the Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652, in which the Congress banned in D.C. "any firearm which shoots ... semi-automatically more than twelve shots without reloading," and the Act of June 2, 1927, No. 372, § 3, 1927 Mich. Laws 887, 888, which prohibited the possession of any "firearm which can be fired more than sixteen times without reloading.”

 Indeed, as we noted in Part I, the present plaintiffs, whilst in the district court, sepa *1268 rately and specifically challenged the ban on certain semi-automatic pistols.

 Moreover, despite the dissent’s contrary assertion (at 1288), a number of states and municipalities, representing over one fourth of the Nation’s population, ban semi-automatic rifles or assault weapons, and these bans are by no means “significantly narrower” than the District’s ban. See N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10 (prohibiting possession, manufacture, disposal, and transport of assault weapons, including AR-15); Conn. Gen.Stat. §§ 53-202a, 53-202c (prohibiting possession of semi-automatic firearms, including AR-15); Cal.Penal Code §§ 12276-12282 (same); Haw.Rev.Stat. §§ 134-1, 134-4, 134 — 8 (banning assault pistols); Mass. Gen. Laws ch. 140, §§ 121-123 (banning assault weapons as defined in expired federal law); Md.Code, Criminal Law, §§ 4-301-4-306 (prohibiting assault pistols); N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5 (prohibiting assault firearms, including AR-15); Legal Cmty. Against Violence, Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Guns Laws, 25-26 (Feb. 2008), http:// www.lcav.org/publications-briefs/reports_ analyses/RegGuns.entire.report.pdf (Boston, Cleveland, Columbus, and New York City prohibit assault weapons, including semi-automatic rifles); Aurora, 111., Code of Ordinances § 29-49 (prohibiting assault weapons, including AR-15); City Code of Buffalo N.Y. § 180-1 (prohibiting assault weapons, including assault rifles); Denver Colo. Mun. Code § 38-130 (same); City of Rochester Code § 47-5 (same). In fact, the District’s prohibition is veiy similar to the nationwide ban on assault weapons that was in effect from 1994 to 2004. See 18 U.S.C. §§ 921(a)(30), 922(v)(l) (prohibiting possession of semi-automatic rifles and pistols, including AR-15).