JENNIFER WALKER ELROD, Circuit Judge,
dissenting:
In holding that Houston’s claim does not implicate the Second Amendment, the majority contravenes the Supreme Court’s recent decisions in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and McDonald v. City of Chicago, — U.S. —, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). As several of our sister circuits have recognized, Heller and McDonald dictate that the scope of the Second Amendment be defined solely by reference to its text, history, and tradition. Yet without textual exegesis or historical evidence, the majority concludes that Houston’s claimed right to his firearm falls outside the scope of Second Amendment protection. In reaching this conclusion, it holds that the Second Amendment does not protect an individual’s “property-like right to a specific firearm” unless the government has prevented him from “retaining or acquiring other firearms.” This exception to the Second Amendment cannot be reconciled with Heller and McDonald.
Given my conclusion that Houston’s claim implicates the Second Amendment, I must reach the question of what test courts should apply in evaluating Second Amendment claims, an open question in this circuit. In applying Heller and McDonald, most of our sister circuits have adopted a two-step approach to Second Amendment claims, step one of which is to determine whether the regulated activity falls within the scope of the Amendment— an exclusively textual and historical inquiry — and step two of which is to apply some level of heightened scrutiny (strict or intermediate) to regulations of Second Amendment-protected activity. Recently, however, Judge Kavanaugh of the D.C. Circuit has articulated an alternative approach, which dispenses with step two on the ground that Heller and McDonald rule out scrutiny analysis. In my view, unless and until the Supreme Court says differently, Judge Kavanaugh is correct that “Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.” Heller v. Dist. of Colum., 670 F.3d 1244, 1271, 2011 WL 4551558, at *23 (D.C.Cir. Oct.4, 2011) (Kavanaugh, J., dissenting). The parties have not addressed whether the district attorney’s policy is sufficiently rooted in the Second Amendment’s text, history, and tradition. I would remand for the district court to consider that question in the first instance.
I also disagree with the majority’s procedural due process analysis. Without any discussion or citation to relevant authority, the majority imposes the novel requirement that a well-pleaded due process claim must include an allegation that the plaintiff has attempted to vindicate his interest *449 through the available judicial remedy provided by the state — the very remedy that Houston challenges as constitutionally inadequate. I would adhere to settled procedural due process principles and hold that Houston has stated a due process claim. Louisiana’s postdeprivation judicial remedy is inadequate because this case does not fall within the Parratt v. Taylor exception to the general rule that “the Constitution requires some kind of a hearing before the State deprives a person of liberty or property.” Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).
I.
Heller and McDonald make clear that courts may consider only the text and historical understanding of the Second Amendment when delimiting the Amendment’s scope. The Supreme Court explained in Heller that it would require “an exhaustive historical analysis” to delineate “the full scope of the Second Amendment.” 554 U.S. at 626, 128 S.Ct. 2783. While declining that undertaking, the Heller Court identified as permissible several types of “longstanding” regulatory measures. Id. at 626-27, 128 S.Ct. 2783. Heller then looked to “historical tradition” alone to reach its conclusion that the government may ban certain classes of “dangerous and unusual weapons.” Id. at 627, 128 S.Ct. 2783. Accordingly, the Court interpreted its prior decision in United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), as establishing “only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns,” because “[t]hat accords with the historical understanding of the scope of the right.” Heller, 554 U.S. at 625, 128 S.Ct. 2783. In summing up its methodological approach, the Court emphasized that “[constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” Id. at 634-35, 128 S.Ct. 2783. The Court then reiterated that exceptions to the scope of the Second Amendment depend on “historical justifications.” Id. at 635, 128 S.Ct. 2783. Two years later in McDonald, the Court confirmed its historical approach, reassuring state governments that Heller “did not cast doubt on [certain categories of] longstanding regulatory measures.” 130 S.Ct. at 3047 (controlling opinion of Alito, J.).
Several of our sister circuits have recognized that Heller and McDonald require a textual and historical approach to the Second Amendment’s scope. See Ezell v. City of Chi, 651 F.3d 684, 702-03 (7th Cir.2011) (under Heller and McDonald, some gun regulations are categorically beyond the scope of the Second Amendment because they regulate activity unprotected by the right to keep and bear arms as publicly understood at the time of ratification); United States v. Chester, 628 F.3d 673, 678 (4th Cir.2010) (Heller established that “determining the limits on the scope of the [Second Amendment] right is necessarily a matter of historical inquiry”); United States v. Rene E., 583 F.3d 8, 12 (1st Cir.2009) (Heller “identified limits deriving from various historical restrictions on possessing and carrying weapons .... These restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment and by Heller.”). But see Nordyke v. King, 644 F.3d 776, 783 (9th Cir.2011) (“heightened scrutiny does not apply unless a regulation substantially burdens the right to keep and to bear arms for self-defense”). The fundamental flaw in the majority’s analysis is its failure to confine itself to text and history in determining the scope of the Second *450 Amendment, as Heller and McDonald require. Because the government has not marshaled any historical evidence that the Second Amendment categorically does not protect particular firearms, the majority errs in recognizing such an exception in this case.[1]
McDonald provides yet another reason why today’s holding cannot be correct. McDonald emphatically rejected the notion that the Second Amendment is “a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.” 130 S.Ct. at 3044-48; see also Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 484, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (“[W]e know of no principled basis on which to create a hierarchy of constitutional values.”). Today’s holding cannot be squared with this guiding principle. In the context of other enumerated constitutional rights, an equivalent per se exception for particular exercises of the right at stake (so long as other exercises of that right are permitted) would be intolerable. Consider, for example, a court holding that the Free Speech Clause affords no protection against the government preventing the publication of a particular editorial in the New York Times because there are plenty of other newspapers that might publish the piece. Or consider a court holding that the Fourth Amendment is inapplicable to the unreasonable seizure of a specific automobile so long as the government does not prevent the owner from borrowing, renting, or purchasing a replacement vehicle.[2] These examples should suffice to show the absurdity of courts recognizing categorical exceptions for each particular exercise of those rights.[3] In carving out such an exception from the Second Amendment, today’s majority impermissibly treats the Amendment as a “second-class right.” McDonald, 130 S.Ct. at 3044.
Instead of undertaking the historical inquiry required by Heller and McDonald, the majority relies entirely on Walters v. Wolf, 660 F.3d 307 (8th Cir.2011), for its conclusion that Houston’s claimed right to his particular firearm does not implicate the Second Amendment.[4] Walters, howev *451 er, emphasized that it did not endorse the per se rule that the Second Amendment does not protect particular firearms. Id. at 318 (“We do not foreclose the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm.”). Moreover, although Walters’s Second Amendment holding is not entirely clear, it appears to be dependent, at least in part, on the court’s prior determination that the plaintiff had stated a valid procedural due process claim. Id. at 317 (“We believe Walters’s valid Due Process claim addresses the gravamen of his complaint.”). Most importantly, insofar as Walters does support the majority’s dismissive treatment of Houston’s Second Amendment claim, we should not follow it. Like today’s holding, Walters is at odds with the Supreme Court’s command that courts may consider only text and history in determining the scope of the Second Amendment.
It is particularly unfortunate for our circuit to endorse the atextual, ahistorical rule that the Second Amendment does not protect particular firearms. In United States v. Emerson, 270 F.3d 203, 218-60 (5th Cir.2001) (Garwood, J.), after an extensive consideration of the text and historical understanding of the Second Amendment, we held that the Amendment “protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms.” We were the first circuit so to hold. See Parker v. Dist. of Columbia, 478 F.3d 370, 380 (D.C.Cir. 2007) (“Federal appellate courts have largely adopted the collective right model [of the Second Amendment]. Only the Fifth Circuit has interpreted the Second Amendment to protect an individual right.”). Heller vindicated Emerson. Yet today’s majority flouts Heller and its imperative to consider only text and history in delimiting the Second Amendment’s scope.
II.
The majority leaves for another day the question of what test applies to Second Amendment claims. Unlike the majority, I must reach this question because in my view Houston’s claim implicates the Second Amendment.
Until recently, almost every circuit court to address this issue has framed the question as a choice between intermediate and strict scrutiny. See, e.g., Heller, 670 F.3d at 1255-56, 2011 WL 4551558, at *8; Ezell, 651 F.3d at 701; Chester, 628 F.3d at 682; United States v. Reese, 627 F.3d 792, 801 (10th Cir.2010); United States v. Marzzarella, 614 F.3d 85, 96-97 (3d Cir.2010). Judge Kavanaugh has recently elucidated an alternative approach, explaining that the Supreme Court’s rejection of an interest-balancing approach also rules out strict and intermediate scrutiny — both forms of judicial balancing. Heller, at 1275-82, 2011 WL 4551558, at *26-32 (Kavanaugh, J., dissenting). Judge Kavanaugh’s dissenting opinion also carefully demonstrates that both Heller and McDonald repeatedly emphasized the central role of text, history, and tradition in analyzing Second Amendment claims. Id., at 1271-82, 2011 WL 4551558 at *23-32. Indeed, Heller “prospectively blessed certain laws for reasons that could be (and were) explained only by history and tradition, not by analysis under a heightened scrutiny *452 test.” Id., at 1280, 2011 WL 4551558 at *80.
For essentially the reasons articulated in Judge Kavanaugh’s convincing dissent, I would hold that the proper test for evaluating Second Amendment claims is as follows:
Gun bans and gun regulations that are longstanding — or, put another way, sufficiently rooted in text, history, and tradition — are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right.
Id., at 1285, 2011 WL 4551558 at *35. Because the parties have not briefed whether the district attorney’s policy passes muster under this test, I would remand to the district court for consideration of this question.
III.
With regard to Houston’s procedural due process claim, I do not agree that Houston’s claim fails because he has not alleged that he has utilized the judicial remedy provided by the state. The majority cites no authority for imposing this novel requirement and offers no justification for why this case requires us to announce this new rule. Thus, even assuming that the majority is correct that Houston could have filed a motion in state court under La.Rev.Stat. § 15:41 (C) for the return of his firearm, that is irrelevant to the proper due process analysis in this case. When Houston filed his complaint, he had no reason to expect that his case would be thrown out for his failure to allege that he has sought relief pursuant to the very state procedure that he alleges is constitutionally inadequate.
I would resolve this case by applying established due process principles. Although the majority has not bothered to address the question, in my view, the proper approach is to begin by resolving the parties’ dispute about whether to classify § 15:41 as a predeprivation or postdeprivation remedy.[5] The answer to this question is not perfectly straightforward because § 15:41 allows for the filing of a motion at any time, either before or after the district attorney “nolle prossed” the charges against Houston. But the problem with classifying § 15:41 as a predeprivation remedy is that Houston could not have utilized § 15:41 to challenge the government’s retention of his firearm after dropping charges until Houston knew that the District Attorney actually dropped charges and refused to return his firearm. Thus, I would analyze § 15:41 as a postdeprivation remedy.
Under the Supreme Court’s case law, postdeprivation remedies are only adequate in the narrow circumstances governed by Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which “represents] a special case of the general Mathews v. Eldridge analysis.” Zinermon v. Burch, 494 U.S. 113, 128, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Under the Parrott rule, postdeprivation remedies are acceptable only where the deprivation results from “a random and unauthorized act by a state employee” rather than *453 “some established state procedure.” Parrott, 451 U.S. at 541, 101 S.Ct. 1908. In that circumstance, because “the State cannot predict precisely when the loss will occur,” id., “the State cannot be required constitutionally to do the impossible by providing predeprivation process.” Zinermon, 494 U.S. at 129, 110 S.Ct. 975.
This case is not governed by Parrott, but by the ordinary rule that “the Constitution requires some kind of a hearing before the State deprives a person of liberty or property.” Id. at 127, 110 S.Ct. 975. According to Houston’s complaint, the District Attorney refused to return Houston’s firearm after dropping charges pursuant to an “established state procedure.”[6] Parrott, 451 U.S. at 541, 101 S.Ct. 1908. Thus, the deprivation was not “a random and unauthorized act by a state employee” that would make it impossible for the state to predict the deprivation and afford predeprivation process. Id. This conclusion also follows from this circuit’s case law applying the Parrott rule. In Caine v. Hardy, the en banc court held that Parratt bars a § 1988 procedural due process claim only if there are adequate state post-deprivation procedures and each of the following conditions is present: (1) “the deprivation must truly have been unpredictable or unforeseeable”; (2) “pre-deprivation procedures must have been impotent to counter the state actors’ particular conduct”; and (3) “the conduct must have been ‘unauthorized’ in the sense that it was not within the officials’ express or implied authority.” 943 F.2d 1406, 1413 (5th Cir. 1991) (en banc). Not one of these conditions is met here.
Even if § 15:41 is construed to be a predeprivation remedy, I still would hold, under a straightforward application of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), that the district court erred in dismissing Houston’s procedural due process claim. In my judgment, the district court undervalued the private interest and overvalued the government’s interest. The district court downplayed the weight of the private interest by reasoning that gun possession “is not a basic necessity of life, such as [welfare benefits] or employment.” But this analysis fails to account for the Supreme Court’s description of the Second Amendment right to gun ownership as “fundamental,” McDonald, 130 S.Ct. at 3037, and the reality that, in certain situations, an individual’s ability to utilize a firearm in self-defense will be nothing less than a matter of life or death. See Heller, 554 U.S. at 599, 128 S.Ct. 2783 (individual self-defense is the “central component” of the Second Amendment). The district court also gave significant weight to the government’s “important interest in preserving evidence of crimes.” There is no doubt that this is a powerful interest, but in my view it loses some of that strength where, as here, the government has dropped charges, has expressed no interest in re-indicting Houston, and has given no other indication of a need to retain the firearm. If, in a particular case, the government does still have a strong interest in preserving the firearm as evidence (for example, if the weapon is also evidence of another crime for which charges or an investigation are pending), it may assert that interest at the due process hearing.
In sum, I would hold that Houston has stated a due process claim because the postdeprivation judicial remedy provided *454 for in § 15:41 is inadequate under these circumstances. If Houston prevailed on the merits of that claim, I would leave it to the district court, in the first instance, to grapple with what specific procedures the state must provide.
IV.
“Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” Heller, 554 U.S. at 634-35, 128 S.Ct. 2783. As lower court judges, our narrow province in constitutional adjudication is to faithfully apply the Constitution as interpreted by the Supreme Court. Because today’s decision runs afoul of Heller, McDonald, and Zinermon — all binding Supreme Court precedents — and our en banc precedent in Caine, I respectfully dissent.

. The majority’s analogy to classes of speech that are unprotected by the First Amendment further underscores the need for historical evidence to establish a categorical exception. Only "historically unprotected” categories of speech are beyond the scope of the First Amendment. United States v. Stevens, — U.S. —, 130 S.Ct. 1577, 1586, 176 L.Ed.2d 435 (2010).

. Indeed, the Supreme Court has expressly rejected this sort of reasoning in the First Amendment context: " ‘[Ojne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.’ ” Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 556, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (quoting Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). Heller itself rejected a strikingly similar argument: "It is no answer to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.” 554 U.S. at 629, 128 S.Ct. 2783; see also Heller, at 1289, 2011 WL 4551558, at *39 (”[T]hat’s a bit like saying books can be banned because people can always read newspapers.”).

. It bears emphasis that I include these examples not because I fear that today’s rule will facilitate the adoption of equivalent exceptions to other Bill of Rights guarantees. Instead, I include these examples to illustrate just how anomalous today’s holding is.

. The majority also cites Heller for the proposition that "[t]he right protected by the Second Amendment is not a property-like right to a specific firearm, but rather a right to keep and bear arms for self-defense.” This citation is misleading, and Heller contains no such statement. Heller unquestionably supports the second clause of the quoted sentence— *451 that the Second Amendment protects the right to keep and bear arms for self-defense — but provides no support for the first clause. Rather, as discussed, the notion that the Second Amendment does not protect specific firearms is incompatible with Heller.

. The relevant deprivation of property occurred at the moment the District Attorney dropped charges against Houston but decided to retain, rather than return, his firearm. There was, of course, a prior deprivation when the government initially seized the weapon, but this was lawful because the seizure was supported by probable cause. Only the second deprivation is at issue. See Walters, 660 F.3d at 314-15 (distinguishing between these two distinct deprivations).

. Houston alleges that "[o]n approximately November 24, 2008, Mr. Houston was told that the new District Attorney, Defendant Cannizzaro, had implemented a new policy providing that firearms seized during arrests would not be returned.” At oral argument, counsel for the district attorney reaffirmed this policy.