KAREN LeCRAFT HENDERSON, Circuit Judge,
concurring in part and dissenting in part:
Regulating firearms in order to combat gun violence is a grave and complex task. The Supreme Court has made that legislative endeavor considerably more difficult by “tak[ing] certain policy choices off the table,” Dist. of Columbia v. Heller, 554 U.S. 570, 636, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and divining a new — and incomplete, see id. at 635, 128 S.Ct. 2783— definition of what the Second Amendment protects. Heller has “hand[ed] our democratic destiny to the courts” by inviting litigants to draw them into this political thicket. J. Harvie Wilkinson III, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L.Rev. 253, 257 (2009). Happily, the “dominoes” have not fallen as quickly as expected, Heller, 554 U.S. at 680, 128 S.Ct. 2783 (Stevens, J., dissenting), as most of our sister circuits have afforded a healthy level of deference to the law-makers. But today I fear the majority has initiated a retreat — at least in part — from the practice of restraint.
My colleagues uphold six District of Columbia firearms laws but strike down four of them. Because I would uphold them all, I concur in part and dissent in part. In my view, the firearms laws that my colleagues invalidate (hereinafter, the remaining laws) satisfy intermediate scrutiny and, accordingly, I would affirm the well-reasoned decision of the district court. See 45 F.Supp.3d 35 (D.D.C.2014).
I. General Principles
Since the Supreme Court’s decision in Heller, this Court analyzes Second Amendment challenges under a two-step framework. First, we ask whether the law “impinges upon” Second Amendment rights, i.e., whether it has “more than a de minim-is effect” on the right to keep and bear arms. Heller v. Dist. of Columbia (Heller II), 670 F.3d 1244, 1252-53 (D.C.Cir.2011). Second, if it does, we evaluate it under “the appropriate level of constitutional scrutiny.” Id. at 1252. In an earlier iteration of this case, we concluded that the challenged laws were “not de minimis” because they were “novel” and “ma[d]e it considerably more difficult for a person lawfully to acquire and keep a firearm ... [for] self-defense in the home.” Id. at 1255 (citing Heller, 554 U.S. at 630, 128 S.Ct. 2783). We also determined that intermediate scrutiny, not strict scrutiny, is the proper yardstick because the laws “do not severely limit the possession of firearms.” Id. at 1257 (alteration and quotation marks omitted).
Intermediate scrutiny has its genesis in the Supreme Court’s equal protection and free speech jurisprudence. See, e.g., Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). It is a middle-ground approach that “offer[s] proper protection in the many instances in which a *282 statute adversely affects constitutionally protected interests but warrants neither near-automatic condemnation (as ‘strict scrutiny’ implies) nor near-automatic approval (as is implicit in ‘rational basis’ review).” United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 2552, 183 L.Ed.2d 574 (2012) (Breyer, J., concurring in judgment). It essentially imposes a balancing test: the law is constitutional if “the governmental interest outweighs the burden [on constitutional rights] and cannot be achieved by means that do not infringe ... rights as significantly.” Minneapolis Star & Tribune Co. v. Minn. Comm’r of Revenue, 460 U.S. 575, 585 n. 7, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). “[T]he fit between the challenged regulation and the asserted objective need only be reasonable, not perfect,” Schrader v. Holder, 704 F.3d 980, 990 (D.C.Cir.2013) (alterations and quotation marks omitted), and the challenged law “need not be the least restrictive or least intrusive means of’ achieving the government’s interest, Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).
The application of intermediate scrutiny “varies to some extent from context to context, and case to case.” Bartnicki v. Vopper, 200 F.3d 109, 124 (3d Cir.1999), aff'd, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). In this case and context, I believe the following principles should shape our analysis.
First, the nature of firearms regulation requires ample deference to the legislature. We have previously held that, in the Second Amendment context, “we afford ‘substantial deference to the predictive judgments of [the legislature].’ ” Schrader, 704 F.3d at 990 (quoting Turner Broad. Sys., Inc. v. FCC (Turner I), 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). This is because “the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional' limits) concerning the dangers in carrying firearms and the manner to combat those risks.” Id. (quotation marks omitted). Firearm policy is a “complex and dynamic” issue implicating “vast amounts of data” that the legislature is “far better equipped” to gather and analyze. Turner I, 512 U.S. at 665-66, 114 S.Ct. 2445. Such “information can be difficult to obtain and the impact of certain conduct difficult to assess,” Holder v. Humanitarian Law Project, 561 U.S. 1, 34, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010), due to the different challenges facing different jurisdictions and the multiple factors that contribute to gun violence. Indeed, the data that does exist is either incomplete or influenced by partisanship:
New topics in the realm of U.S. justice and politics elicit a more polarizing response than that of gun control.... At the center of the debate is the fundamental question of whether firearms, specifically those owned and wielded by private citizens, do more harm than good in deterring violent crime. Despite intense scrutiny from so many fields, however, scholars have reached few solid conclusions to date. The answers to even basic questions (who is victimized, how many are victimized, and at what cost are they victimized) are fiercely disputed, resulting in a nebulous yet hotly contested understanding of the interplay between guns and crime.... Data exists to support both sides; the difficulty lies in separating partisanship and underlying attitudes from empirical observation and objective analysis. In truth, the isolation of such objectivity may be a logical impossibility.
II Amekican Political Culture: An Encyclopedia 505-06 (Michael Shally-Jensen ed.2015). Intermediate scrutiny is a flexible framework that allows for different perspectives and a range of approaches to *283 firearms regulation. See Fla. Bar v. Went For It, Inc., 515 U.S. 618, 632, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (intermediate scrutiny does not require “the single best disposition” to problem); Time Warner Entm’t Co., L.P. v. United States, 211 F.3d 1313, 1322 (D.C.Cir.2000) (“In applying intermediate scrutiny, we inquire ‘not whether Congress, as an objective matter, was correct....’” (quoting Turner Broad. Sys., Inc. v. FCC (Turner II), 520 U.S. 180, 211, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (emphasis added))).
Indeed, judicial humility is especially important in the context of firearms regulation. Although our Second Amendment precedent draws on First Amendment and voting-rights cases, see, e.g., Heller II, 670 F.3d at 1257, the right to bear arms is meaningfully different from the rights to speak and vote. See Bonidy v. USPS, 790 F.3d 1121, 1126 (10th Cir.2015) (“The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that ... can be exercised without creating a direct risk to others.”). At the same time, however, the Second Amendment is not a “second-class right,” McDonald v. City of Chi., 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality), but the reality of gun violence means our constitutional analysis should incorporate deference to the legislature, see Humanitarian Law Project, 561 U.S. at 34-36, 130 S.Ct. 2705. One of our sister circuits said it well:
This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.... If ever there was an occasion for restraint, this would seem to be it.
United States v. Masciandaro, 638 F.3d 458, 475-76 (4th Cir.2011).
Second, the District of Columbia is sui generis. The plaintiffs are quick to point out that the District’s firearms laws are the toughest in the country and that a few have no parallel in other jurisdictions. But their point is unhelpful if the District is different from other jurisdictions. And it is. Most notably, the District is the seat of our national government. The record amply documents the unique security risks presented by a city full of high-level government officials, diplomats, monuments, parades, protests and demonstrations and, perhaps most pertinent, countless government buildings where citizens are almost universally prohibited from possessing firearms. See, e.g., 18 U.S.C. § 930(a), (g)(1) (unlawful to “knowingly possess[ ] or cause[ ] to be present a firearm or other dangerous weapon in ... a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties,” other than a Federal court facility); id. § 930(e)(1) (unlawful to “possess[] or eause[] to be present a firearm or other dangerous weapon in a Federal court facility”); 40 U.S.C. § 5104(e)(1)(A) (unlawful to “carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm”); see also 18 U.S.C. § 922(q)(2)(A) (making schools gun-free zones); Lanier Test. 2-5. Indeed, walking around this town, one gets the impression that it is one big government building. Cf. Heller, 554 U.S. at 626, 128 S.Ct. 2783 (“the right secured by the Second Amendment is not unlimited” and can give way to regulations of “the carrying of firearms in sensitive places” like “government buildings”). Although the Constitution does not stop at the Beltway, our analysis should account for the unique challenges that confront the District as it struggles to regulate firearms in our Nation’s capital. See City of L.A. v. Alameda *284 Books, Inc., 535 U.S. 425, 439-40, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (“A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously.”).
II. The' Remaining Laws
My colleagues strike down the District’s laws requiring registrants to pass a knowledge test, D.C.Code § 7-2502.03(a)(10); present their firearms for inspection, id. § 7-2502.04(c); renew their registration every three years, id. § 7-2502.07a(a); and register no more than one pistol per month, id. § 7-2502.03(e). I address these laws seriatim and explain why, in my view, each one satisfies intermediate scrutiny.
A. Knowledge Test
Before an individual can register a gun, he must demonstrate his knowledge of the District’s firearms laws by passing a test.' Id. § 7-2502.03(a)(10). The test is not particularly onerous: it consists of two pages with thirteen multiple-choice questions and two True/False questions.[1] The examinee must answer eleven questions correctly (a score of 70%). He need pass the test only once, id., and he can retake it as many times as he wants. See 24 DCMR § 2311.7-.8. The test is intended to ensure gun owners have a “basic level of knowledge” about the District’s firearms laws. Comm. Report 17. Those laws, in turn, promote the public safety. Id.
The' plaintiffs contend, and my colleagues agree, that the District presented “no evidence” its knowledge test furthers its alleged interests. Appellants’ Br. 53-54; Maj. Op. 278-79. But the notion that test-taking promotes knowledge is obvious — ask any teacher, student or professional licensing board in the country. See Delaware v. Prouse, 440 U.S. 648, 658, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (“States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles ... [and] are sufficiently familiar with the rules of the road.... ”); Levitt v. Comm. for Pub. Educ. & Religious Liberty, 413 U.S. 472, 480, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) (“a regular program of traditional internal testing designed to measure pupil achievement” plays an “obviously integral role ... in the total teaching process”); Schware v. Bd. of Bar Exam., 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (“A State can require high standards of qualification, such as ... proficiency in its law, before it admits an applicant to the bar.... ”). Several of the District’s experts testified to that effect. See Lanier Decl. ¶¶ 23-24; Jones Deck ¶ 23; Webster Deck ¶ 35; Lanier Test. 2; Jones Report 10. Under intermediate scrutiny, the District does not need to cite empirical studies for the common-sense notion that mandatory testing promotes knowledge of, and obedience to, its laws. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (“[W]e have permitted litigants ... even[ ] in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and ‘simple common sense.’ ” (quoting Went For It, 515 U.S. at *285 628, 115 S.Ct. 2371 (emphasis added))); Nat’l Cable & Telecomms. Ass’n v. FCC, 555 F.3d 996, 1002 (D.C.Cir.2009) (we do not require “exhaustive evidence documenting the necessity of [a given law]” and we have “relied on [the legislature’s] reasonable, commonsense determination that [the law is] required”). See generally Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (“The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised”).
*284 Firearms may be lawfully discharged on public space in the District of Columbia:
(A) Into the air on New Year's Eve.
(B) At registered turkey hunts on Thanksgiving.
(B) After obtaining a special written permit from the Chief of Police authorizing the weapon to be discharged on public space.
*285 The plaintiffs do not identify any alternative means by which the District can achieve its goals. Their implied alternative — no test at all — is plainly lacking. Given the uniqueness and complexity of the District’s firearms laws, it has an especially pressing need to educate its citizens about their contents. Under intermediate scrutiny, the District can “add[ ] a prophylaxis to the law,” even if it “focuses upon behavior already arguably proscribed by other laws.” Time Warner, 211 F.3d at 1320; see also United States v. Mahin, 668 F.3d 119, 127 (4th Cir.2012) (“The Second Amendment does not disable Congress and the states from erecting preventative measures-” (emphasis added)). Granted, in criminal cases, courts usually presume that individuals know the law. See McFadden v. United States, — U.S.-, 135 S.Ct. 2298, 2304, 192 L.Ed.2d 260 (2015) (“[I]gnorance of the law is typically no defense to criminal prosecution.... ”). But this presumption is a legal fiction, not an accurate description of the world. See McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); see also John Selden, Table-TalK 174 (Constable & Co. 1827) (“Ignorance of the law excuses no man; not that all men knoiv the law, but because ’tis an excuse every man will plead, and no man can tell how to confute him.” (emphasis added)). All too often, individuals do not know the law and legislatures do well to ensure they are informed before they can own and use a ' dangerous weapon.
In sum, I believe the District’s knowledge test satisfies intermediate scrutiny. It ensures a gun owner has a basic understanding of the District’s firearms laws— laws that unquestionably promote the public safety.
B. Presenting the Firearm
The Metropolitan Police Department (MPD) can require a potential registrant to present his firearm for inspection. D.C.Code §' 7-2502.04(c). The law has an obvious, straightforward purpose: verification. See Appellees’ Br. 47-48; Defs.’ Summ. J. Reply Br. 25 n. 21. The MPD wants to conduct a physical inspection to “verify that the application information is correct and that the firearm has not been altered.” Appellees’ Br. 47-48; see 24 DCMR § 2313.8(c) (“The Director may require an applicant to return with the firearm if ... the information relating to the weapon on the application [appears] incorrect, misleading, or incomplete.”). It also wants to ensure the firearm is in. safe operating condition and does not belong to a prohibited class of weapons. See 24 DCMR § 2313.8(b) (“The Director may require an applicant to return with the firearm if ... the firearm may be unregisterable, defective, or in a dangerous condition or state of disrepair.”).
The plaintiffs contend, and my colleagues agree, that physically inspecting a firearm is unnecessary because no one would both register a firearm and lie about its physical' characteristics — they would simply decline to register it in the first place. See Maj. Op. 277. But the present-the-firearm requirement is not *286 targeted at falsehoods only; the District is also worried about innocent mistakes. See 24 DCMR § 2313.8(c) (“The Director may require an applicant to return with the firearm if ... the application [appears] incorrect ... or incomplete.” (emphases added)). And many registrants will not be aware that their firearm is unsafe to operate or ineligible to be registered, see id. § 2313.8(b), until they present it and allow the MPD to take a closer look.
The plaintiffs further contend that the District’s interest in verification is outweighed by the burdens that presenting the firearm imposes on registrants. According to the plaintiffs, a person who presents his firearm to the MPD could be arrested, have his gun stolen or be mistaken for an assailant. These risks, in my mind, are quite overblown. For starters, it is not a crime to transport a firearm to the MPD for the purpose of registering it. See D.C.Code §§ 22-4504.01; ■ 22-4504.02(a); 18 U.S.C. § 926a. Moreover, registrants are instructed to leave their firearm at home unless asked to present it, 24 DCMR § 2313.7, and must transport the firearm “in accordance with [section] 22-4504.02,” D.C.Code § 7-2502.04(c)— ie., unloaded, stored in a locked container, separate from any ammunition and inaccessible to the driver and any passenger, see id. § 22^504.02(b)-(c). These provisions minimize the risk of an accident. And any remaining risk of theft or misunderstanding is an inherent feature of owning a firearm — not a unique problem created by the District’s laws.
Accordingly, I believe the present-the-firearm requirement satisfies intermediate scrutiny. It imposes a slight burden on registrants and allows the District to verify that the firearm is described correctly, has not been altered, is safe to operate and is eligible for registration.
C. Re-Registration
The District’s registration certificates expire every three years. Id. § 7-2502.07a(a). Thus, a gun owner who wants to maintain his registration must periodically renew it. Id. Renewal is “simple” by design. Comm. Report 10. The registrant fills out a two-page form online, by mail or in person. D.C.Code § 7-2502.07a(c). The form includes a questionnaire to determine whether the registrant remains qualified to possess a firearm and requests his current address and an attestation that he continues to possesses the firearm. See Firearms Registration Renewal Application, MetRo. Police Dep’t, available at http://mpdc.dc.gov/sites/ default/files/dc/sites/mpde/publication/ attachments/Firearms% 20Registration% 20Renewal% 20Form% 2012.18.13.pdf (last visited September 17, 2015).[2] The District reminds a registrant to renew his certificate ninety days in advance, D.C.Code § 7-2502.07a(e)(l), and gives him a ninety-day grace period after the renewal period expires, see 24 DCMR § 2326.4. Re-registration serves several purposes. It promotes public safety by allowing the District to monitor whether a gun owner has fallen into a class of people who cannot legally possess a firearm (e.g., felons, the *287 mentally ill, subjects of protective orders). See Comm. Report 4, 11-12; Jones Decl. ¶ 23; Lanier Decl. ¶ 21; Vince Decl. ¶ 22; Webster Decl. ¶ 30. And it keeps the District’s firearms registry up to date. See Comm. Report 4, 10. The MPD needs updated information, including the registrant’s most recent address, so that it knows where to retrieve the firearm if the owner becomes disqualified to possess it. See Lanier Decl. ¶ 21; Webster Decl. ¶ 30; see also Appellees’ Br. 48 (“The District ... has a population that is significantly more transient than other states.”). Moreover, re-registration helps combat the loss and illegal transfer of firearms by requiring a registrant to account for his weapons on a regular basis and by providing MPD with “up-to-date information about the firearm’s last legal whereabouts.” Comm. Report 11; see also id. at 8, 10; Webster Decl. ¶ 30.
The plaintiffs argue that the District could achieve each of these goals with less burdensome alternatives. As for ensuring that a registrant does not fall into a disqualified class, the plaintiffs note that the District is free to run background checks whenever it pleases. Yet background checks are less efficient and effective than a universal re-registration requirement, the latter ensuring that everyone remains eligible to own a firearm. See Jones Decl. ¶24 (re-registration provides “mandatory accountability to ... public safety officials”); id. at ¶ 23 (re-registration “compels a systemic review of all legally registered firearms and registrants”). “Of course, administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny. However, such considerations are relevant to [the Second Amendment analysis].” Bonidy, 790 F.3d at 1127 (emphasis added). At bottom, the District needs to show that re-registration does not burden “substantially more [rights] than is necessary,” not that it is the “least intrusive means” of keeping tabs on gun owners. McCullen v. Coakley, — U.S. -, 134 S.Ct. 2518, 2535, 189 L.Ed.2d 502 (2014) (quoting Ward, 491 U.S. at 798-99, 109 S.Ct. 2746). Assuming they could reveal all the reasons someone might become disqualified- to possess a firearm (a dubious proposition, see generally D.C.Code § 7-2502.03(a)), I fail to see how dragnet background checks are “substantially” less burdensome than filling out a two-page form every three years. McCullen, 134 S.Ct. at 2535. Moreover, background checks plainly do not further the District’s interests in updating its firearms registry and promoting accountability of gun owners.
As for the latter interests, the plaintiffs point out that a gun owner is already required to notify the District if he changes his address or loses his firearm. See D.C.Code § 7-2502.08(a). But the District tried to rely on registrant notification for several years and the experiment failed. According to the Committee Report, “[relying on notification alone] has not been effective. Thousands of registrants have moved, died, disposed of their' guns (or perhaps lost them) and have not notified MPD.... [M]any registrants cannot be located.” Comm. Report 10; see also Jones Decl. ¶ 24. Instead of continuing to depend on registrant-initiated notification, the District’s re-registration requirement provides “mandatory accountability” by forcing a registrant to update his information under threat of cancellation. Jones Decl. ¶ 24; see also Vince Decl. ¶ 22; Webster Decl. ¶ 30 (reregistration “is analogous to the widely-accepted Federal requirement that licensed gun dealers be audited periodically to make sure that they can account for their firearms”). This is a permissible al *288 ternative under intermediate scrutiny. See Nat’l Cable & Telecomm’ns Ass’n, 555 F.3d at 1002 (affirming opt-in scheme because “opt-out is only marginally less intrusive than opt-in” and agency “carefully considered the differences between the[] two” and made “reasonable, commonsense determination” (citation omitted)). “[T]he Constitution does not require that the [District] choose ineffectual means.” Rosario v. Rockefeller, 410 U.S. 752, 762 n. 10, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).
My colleagues do not believe the reregistration requirement deters the loss or illegal transfer of firearms because it does not require a registrant to produce the gun; it “requires only that [he] affirm that he still has [it].” Maj. Op. 278. In other words, my colleagues believe registrants will not be truthful on their re-registration forms. The plaintiffs do not make this argument in their briefs, however, so we need not — indeed, should not — consider it. See Schrader, 704 F.3d at 991-92. Nor is the argument persuasive. A re-registrant must attest, under penalty of perjury, that he still possesses the firearm. See Firearms Registration Renewal Application, supra, at 286. In my view, the District reasonably assumes that most re-registrants' will tell the truth. Cf. Rehberg v. Paulk,-U.S.-, 132 S.Ct. 1497, 1505, 182 L.Ed.2d 593 (2012) (threat of perjury prosecution adequately deters false testimony).
In short, I believe the District’s re-registration requirement passes constitutional muster. It imposes only minimal burdens on Second Amendment rights and simultaneously satisfies the District’s interests in preventing disqualified people from owning firearms, keeping the firearms registry up-to-date and deterring the loss and illegal transfer of firearms.
D. One Pistol Per Thirty Days
The District prohibits a registrant from registering more than one pistol in the same thirty-day period. D.C.Code § 2502.03(e); 24 DCMR § 2305.3; see also D.C.Code § 7-2501.01(12) (defining “pistol” as “any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length”). This limitation does not apply to an individual who relocates to the District and wants to register pistols he lawfully owned in another jurisdiction for at least six months. D.C.Code § 7-2502.03(e); 24 DCMR § 2305.4.[3] The parties agree that the purpose behind the one-pistol-per-thirty-days rule is to stem the illegal trafficking of handguns. See Comm. Report 10, 14-15.
The plaintiffs argue, however, that the one-pistol-per-month limitation does nothing to further this goal. No one, they point out, would bring pistols into the District, register them and then traffic them. The person would simply never register the pistols at all. But the plaintiffs focus on the wrong side of the equation. The one-pistol-per-thirty-days limitation is directed at the supply side, rather than the demand side, of illegal handgun trafficking. As stated in the Committee Report:
The law burdens gun traffickers and the straw purchasers they hire to supply them with guns, and it makes it more difficult for the rare dirty gun dealer who is willing to look the other way when a single individual walks in to his store asking to buy five or 10 or even 20 or more inexpensive handguns to be sold on the street.
*289 Comm. Report 16 (quoting Douglas Weil, A Law that Gun-Rights Advocates Should Be Fighting to Keep, Wash. Post (Feb. 17, 2012), http://www.washingtonpost.com/ opinions/a-law-that-gun-rights-advoeatesshould-be-fighting-to-keep/2012/02/16/g IQAvcASKR_story.html); see also Jones Decl. ¶ 18; Lanier Decl. ¶ 29; Vince Decl. ¶ 17. In other words, the one-pistol-per-thirty-days limitation deters dealers from selling more than one handgun at a time because they know multiple handguns cannot be registered and, thus, cannot be possessed or used for lawful purpose. The Committee Report points to Virginia as an example of a jurisdiction that, after enacting a similar law, successfully reduced illegal handgun trafficking. See Comm. Report 15-16; see also Jones Decl. ¶ 19. True, notwithstanding the one-pistol-per-thirty days limitation, a firearms trafficker could acquire handguns from another jurisdiction and transport them into the District. See Maj. Op. 280. But the law nonetheless deters the rapid acquisition of multiple firearms within the District. See Comm. Report 16 (“Since other states permits multiple gun sales — including, now, Virginia — our District law remains important. Indeed, the other states should follow, so as to erect a wide web to frustrate the traffickers.”) The District need not— indeed, cannot — solve problems created by the relatively lax firearms laws in other jurisdictions. Cf. Williams-Yulee v. Fla. Bar, — U.S.-, 135 S.Ct. 1656, 1668, 191 L.Ed.2d 570 (2015) (even under strict scrutiny, “[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most processing concerns”).[4]
Given the record evidence supporting it, the one-pistol-per-thirty-days limitation is constitutional — a conclusion that is bolstered by the fact that it imposes very little burden on Second Amendment rights. The plaintiffs contend — and my colleagues suggest, see Maj. Op. 280-81— that an individual has as much constitutional right to a second pistol as he does the first. They note that the Second Amendment discusses the right to keep and bear “Arms,” plural. See id. But I doubt their textual point has much force: the Second Amendment also uses the word “people,” plural, so the “s” on “Arms” is grammatically necessary. And Heller does not support their position either. The “core” of the Second Amendment is the right to use a firearm for self-defense in the home, Heller, 554 U.S. at 630, 128 S.Ct. 2783 — a right that is vindicated with one handgun. The plaintiffs’ position has no stopping point: it would authorize everyone to possess his own Rambo-style armory. Cf. id. at 627, 128 S.Ct. 2783 (noting that Second Amendment does not protect right to form “effective” militia (emphasis added)). In any event, we need not decide whether the Second Amendment protects the right to a second firearm as much as the first firearm because, even assuming it does, the one-pistol-per-month limitation is only a small (and temporary) limit on Second Amendment rights. It imposes a thirty-day waiting period on the right to acquire a second pistol — an acceptable burden, given the availability of the first pistol, the availabili *290 ty of other firearms and the deadly costs of illegal handgun trafficking. Cf. Rosario, 410 U.S. at 760-62, 93 S.Ct. 1245 (requiring party registration eight months in advance of presidential primary is constitutional means of preventing one party’s voters from designating themselves as another party’s voters).
In conclusion, I agree with my colleagues’ decision to uphold the District’s long-gun registration, registration fee, in-person appearance, photographing, fingerprinting and training requirements. Those parts of the majority opinion display proper deference to the District in its ongoing efforts to formulate a workable firearms policy for our Nation’s capital. I believe my colleagues too readily abandon this approach, however, with respect to the knowledge test, present-the-firearm, reregistration and one-pistol-per-thirty-days requirements. Accordingly, I respectfully dissent in part.

. The questions are not difficult. Consider, for example, Question 3:

. To renew the certificate for a firearm registered before January 1, 2011, a registrant must also appear in person and be fingerprinted. See 24 DCMR § 2326.2. This process is a one-time requirement and does not apply to subsequent renewals. See Firearms Registration Renewal: Complete Renewal Procedures, Metro. Police Dep’t, available at http://mpdc.dc.gov/page/firearms-registration-renewal-complete-renewal-procedures (last visited September 17, 2015) ("Subsequent registration renewals will be done online or by mail.”). It is constitutional for the same reasons that the re-registration, fingerprinting and in-person appearance requirements are constitutional.

. And the one-pistol-per-thirty-days limitation applies to the initial registration only; an individual can simultaneously re-register as many pistols as he wants. See 24 DCMR § 2305.3.

. My colleagues point out that the sources cited in the Committee Report discuss limitations on the purchase, not the registration, of handguns. See Maj. Op. 280. The plaintiffs, however, do not make this argument and I do not believe we should do so on their behalf. See Schrader, 704 F.3d at 991-92. Even if we did, I think any distinction between purchase and registration is immaterial. Because the District prohibits the possession of unregistered firearms, D.C.Code § 7-2502.01(a), a limitation on registration is the functional equivalent of a limitation on purchases.